Charles Ansel **HAMPTON**, Petitioner,

v.

Harry C. **TINSLEY**, Warden, **Colorado State Penitentiary**, Respondent.

**Civ. A. No. 8650.**

United States District Court
D. Colorado.
April 8, 1965.

Roland E. Camfield, Jr., Denver, Colo., for petitioner.

Duke W. Dunbar, Atty. Gen., James W. Creamer, Jr., Asst. Atty. Gen. for the State of Colorado, Denver, Colo., for respondent.

DOYLE, Judge.

This is on petition for writ of habeas corpus. The petitioner, a state prisoner who is confined in the Colorado State Penitentiary at Canon City, entered a plea of guilty in the District Court for Arapahoe County to the offense of assault with intent to commit rape on December 24, 1953. Thereafter he was sentenced pursuant to the Sex Offenders Act, Chapter 39, Article 19 of 1953 and 1963 Colorado Revised Statutes, to the Colorado Psychopathic Hospital at Pueblo for a period of not less than one day nor more than his natural life.

Subsequently, on December 1, 1960, by order of the Governor of Colorado, petitioner was transferred to the Colorado State Penitentiary at Canon City for safekeeping. The order further provided: " * * * and that he remain in said institution until and unless a further

order is issued by the Chief Executive of the State of Colorado."

In his homemade petition for issuance of a writ of habeas corpus, it is alleged that defendant has not been convicted of any crime but in fact was found not guilty by reason of insanity. Notwithstanding the alleged form of the judgment, the petition continues that when he was sent to the penitentiary for safekeeping he was not assigned to the cell house which has to do with mental patients, but instead was given a penitentiary classification number and that since 1960 he has been invalidly confined as a convicted inmate of the penitentiary.

Counsel was appointed, and following the issuance of an order to show cause the basis for the present petition was articulated more clearly in the traverse filed by petitioner's counsel to the answer of the State of Colorado. The points which are there set forth and which form the basis of these proceedings are the following:

1) [Referring to the petitioner] That his guilty plea was accepted although he was informed of incorrect sentence alternatives;

2) That at the time he was sentenced and judgment was pronounced petitioner was insane, or at least the judge had reasonable doubt of his sanity, all in violation of C.R.S. '53, 39–8–6; furthermore, that petitioner was denied a jury trial on the issue of his sanity at the time of judgment and at the time of sentencing;

3) That the State of Colorado has violated the spirit and the letter of the sentence in that the Executive Branch of the State Government has increased the severity of the sentence without due process of law.

The respondent maintains that this Court lacks jurisdiction because of the failure of petitioner to exhaust his state remedies as required by Title 28 U.S.C. § 2254.

The question whether there has been sufficient exhaustion of state remedies has been previously considered by this Court and a Memorandum Opinion and Order handed down on December 13, 1964. The efforts of the petitioner to attract the attention of the State courts are sufficiently described in that order so that it is unnecessary to repeat any of those matters. It is sufficient to say that this Court is convinced that it has jurisdiction to consider this case on its merits.

It is to be noted that when this matter first came before the District Court for the County of Arapahoe, the Honorable Osmer E. Smith, Judge, immediately appointed counsel to represent the accused. The offense was a particularly heinous one because of the fact that the alleged victim of the assault was the defendant's mother. Furthermore, there was no lack of effort on the part of the very conscientious Judge Smith to protect the defendant's rights. Following the entry of the plea of guilty on December 24, 1953, the trial Court noted that "the defendant herein does need some further treatment." This observation was based upon a letter which was then before the Court from the Colorado Psychopathic Hospital. The trial Court's Order then continued:

"IT IS ORDERED that the staff physicians at the Colorado Psychopathic Hospital shall submit to the Court a complete report concerning the defendant Charles Ansel Hampton and include therein all facts and findings necessary to assist this Court in determining whether it shall impose sentence under the provisions of said Chapter 89, Session Laws of Colorado, for the year 1953. [The Sex Offenders Act heretofore referred to]."

Following the entry of this Order the Court proceeded to admonish the defendant as to the consequences of his plea of guilty. After ascertaining that the defendant was then eighteen years of age, the Court said:

"Before accepting your plea of guilty to the second count of the information, the Court desires to

advise you that you could be sentenced—How old is this boy?

"MR. FITZPATRICK: Eighteen.

"THE COURT: There are two possibilities there:

"You can be sentenced to the State Penitentiary at Canon City for a term of not less than one nor more than fourteen years, or possibly to the State Reformatory at Buena Vista for an indeterminate term as provided by law until released by the Warden. The place to which you would go would depend upon your former record and possibly somewhat upon the discretion of the Court.

"Now, also under a law passed by the Legislature in 1953, in lieu of the sentence provided by law,—that is in lieu of the sentence that I have just now advised you about—the Court may sentence you to any state institution—and that includes mental institutions as well as penal institutions—'as hereinafter provided' for an indeterminate term, for a minimum of one day and a maximum of your natural life.

"Now, having advised you of the consequences of your plea of guilty to the second count, do you still desire to plead guilty?

"THE DEFENDANT: Yes, sir.

"THE COURT: All right. The plea of guilty will be received. That is all, and you will be remanded back to the custody of the Sheriff until we see whether they want you any more out at the Psychopathic Hospital."

On January 11, 1954, the matter came on for sentencing under the 1953 Act (that previously referred to) and the Court proceeded to pronounce the sentence of not less than one day nor more than life. In the course of pronouncing sentence the Court found that the defendant had been in the Colorado Psychopathic Hospital and that a report had been rendered. The Court further found that the matters contained in the report were such as to authorize and justify the imposition of sentence pursuant to the Act. The Court further concluded that the defendant constituted a threat of bodily harm to the members of the public and "is unquestionably mentally ill." The Court then continued: " * * * in lieu of the sentence as provided by law, hereby sentences Charles Ansel Hampton to the Colorado State Hospital at Pueblo for a period of not less than one day nor more than his natural life."

It is noteworthy that the defendant firmly believed that he had been committed as an insane person and that he was not sentenced to a penal institution; in fact, he believed that he had been adjudged not guilty by reason of insanity. At the hearing which was held in this Court on February 2, 1965, the defendant was firmly of this belief.

It is not difficult to understand why the defendant might have been confused considering the proceedings as set forth above. In this connection it is to be noted that the plea of guilty was not entered by the accused, but by his counsel; in his presence, to be sure. The following discloses this:

"MR. GRAHAM: (The Deputy District Attorney) At this time we ask that the defendant enter his pleas as to the first count of the information and also the second count.

"MR. FITZPATRICK: The plea to the first count of the information is not guilty; and the plea to the second count of the information is guilty."

The confusion of the defendant arises from the fact that he was committed to the Colorado General Hospital for observation and report and that the judge made a finding that he was mentally ill when he sentenced him. Moreover, the proceedings in open court strongly suggest that this was a commitment rather than a sentence. In any event, we are convinced that the defendant is truthful in asserting that he believed that he was being committed as a mental incompetent.

The evidence before the Court relative to the condition of the accused at the time is highly relevant. On December 10, 1953, a report was given to the Court by Dr. Theodore Chemodurow, Psychiatric Resident at the Colorado Psychopathic Hospital. In this letter, Dr. Chemodurow expressed the opinion that: "We feel that he knows right from wrong. He, however, has deep-seated impulses which he cannot control and of which he is unaware, but must act upon these impulses. This explains his aberrant and uncontrollable sex behavior which makes him dangerous to himself and to his family and to society. It is our opinion that he will receive maximum benefit within an institutional setting." One gleans from this the definite impression that the doctor was reporting that although the defendant knew the difference between right and wrong, he was unable to control his impulses and was unable to refrain from doing wrong. Seemingly, the report given was ambiguous because on December 24, 1953, the Court demanded a complete report to include the facts and findings necessary to assist the Court in pronouncing sentence. At that time the Court stated: "Also if you want this boy back at the hospital for further observation, kindly advise." Following that, Dr. John N. Fortin wrote, on December 29, 1953, that Dr. Theodore Chemodurow was on vacation. A detailed report was forwarded. In Dr. Fortin's letter it was said:

"Our opinion, as stated previously, is that the patient, Charles Ansel Hampton, will receive maximum benefit from institutional care. He is sane, but impulse-ridden and cannot control these needs. His acting out behavior which is particularly dangerous in the sexual sphere will not be improved by any form of psychiatric treatment. He is capable of violence and is considered, by us, as a very dangerous individual and a possible candidate to either escape or suicide."

While in the above-quoted letter it was stated that the petitioner was sane, the report nevertheless went on to create doubt by adding that he was "impulse-ridden" and unable to control these needs. The detailed report which was forwarded to Judge Smith stated that the defendant had just served sixteen months at the Colorado State Reformatory and that on his return home he committed the offense that is the subject of the charge. It recites his psychiatric history which disclosed an effort to commit suicide in August, 1951, by jumping off a two hundred fifty-foot waterfall at Idaho Springs. He had been previously examined in the Colorado State Hospital and was found to have an I.Q. of 85; his difficulties at the State Reformatory are described; his family history disclosed that his father died when he was very young and that the defendant had had difficulties with his stepfather since the mother's remarriage. His mental status showed him to be of limited intelligence and to be suffering from impairment of judgment and unpredictable behavior. The conclusion was:

"* * * He is ridden with impulses that he cannot control: he is unable to postpone any pleasure which must be gratified immediately. Obviously, his sexual aberrant behavior is pathological, but also dangerous, because not only does he seek to carry out these unacceptable impulses, but becomes violent and sadistic if he cannot fulfill them completely. He has been rejected from infancy and has developed a number of problems in attempting to satisfy both his dependent and independent needs. Authority is rejecting and therefore unacceptable, every possible means to express his hostility against it is used, even if it means self-destructiveness. He is prone to be explosive and therefore should be considered very dangerous and a possible candidate to either escape or suicide."

"Prognosis: Poor."

Although the defendant has not been receiving extensive treatment during con-

finement, there are reports in the file which furnish some insight as to his present condition. On April 14, 1961, the Staff Psychiatrist at Colorado State Penitentiary reported, in referring to the transaction forming the basis of the charge herein: It falls within the category of what Dr. Meninger refers to as "episodic dyscontrol." The doctor continued that during such a period the man is essentially outside the bounds of reality and can be considered, psychologically speaking, psychotic and not responsible for his acts.

Prior to the hearing herein, an up-to-date evaluation was requested and obtained from the State penitentiary. The physician who gave the report and who testified at the hearing was of the opinion that the defendant was not psychotic and was not insane at the time of the alleged offense. He stated further that his many years of confinement as well as growing older during that time, has made him less likely to be impulsive or aggressive. "I cannot guarantee that he will not be assaultive, but I do believe that such behavior in the future would be unlikely. After eleven years of confinement during which time intensive psychotherapy was attempted, as well as treatment with the newer psychotropic drugs, have been completely without success. I doubt very much that he will ever benefit from treatment because I doubt that he will ever consciously realize the need of it."

The important question for consideration here is whether from the evidence before the State trial court it appeared that defendant was at the time of sentence and judgment insane, and whether the failure on the part of the judge and the defendant's court-appointed counsel to grant to the accused a jury trial of insanity prior to his commitment constituted a substantial violation of his constitutional rights.

Little in the way of comment can be added to the facts detailed regarding the condition of the accused at the time of the entry of the plea herein and at the time of the sentence. The highlights of the evidence are that the judge found the defendant mentally ill and at least one of the reports submitted to the court held that the accused could not control his behavior. Of course, whether the accused's impulses were irresistible is not a correct test of his sanity with respect to the entry of the plea or the pronouncement of judgment. The Colorado statutes contain the applicable definitions. C.R.S. '53, section 39–8–6 makes provision for a defendant who is insane at the time of the entry of the plea or the pronouncement of judgment. It declares that if a jury is impaneled to determine whether a defendant is insane at the time of the impaneling and if it is concluded that he is sane, the trial on the merits shall proceed. If it is concluded that he was insane at that time he shall be forthwith committed to the State Hospital at Pueblo, to be confined until he is no longer insane, following which he shall be tried on the criminal charge against him. It further provides that in any of these cases the judge of the Court, if he believes the defendant is insane, *or has a reasonable doubt thereto,* on his own motion may impanel a jury to determine by a preponderance of the evidence whether he has thus become and then is insane.

The appropriate test for determining whether the accused was insane at the time of entry of plea or pronouncement of sentence is also set forth in the Colorado Statutes as they existed at the time. C.R.S. '53, section 39–8–6(8), as follows:

" 'The defendant is not to be considered as insane if he has sufficient intelligence to understand the nature and object of the proceeding against him and to rightly comprehend his own condition with reference to such proceeding, and has sufficient mind to conduct his defense in a rational and reasonable manner, although on some other subjects his mind may be deranged or unsound.' "

Even though the irresistible impulse test is not the appropriate one for determining whether a defendant has capacity to plead guilty or to be sentenced, the fact that a man is so affected and is also mentally ill and at times

psychotic, certainly raises a question as to his sanity. The bizarre nature of the offense was apparently such that the trial court believed that the accused was mentally ill. Nevertheless, the inquiry was not whether he was legally sane; instead, it always looked to whether he was eligible for sentencing under the so-called Sex Offenders Act. C.R.S. '53, Ch. 39, Art. 19. There was neither a trial nor a hearing to ascertain whether the accused was insane at the time of the commission of the offense or at the time of the entry of the plea and pronouncement of sentence. There was a failure on the part of the defendant's court-appointed counsel and also on the part of the Court to focus on the question whether the defendant had the capacity to enter a plea; indeed, the defendant did not enter a plea—his lawyer entered it for him and, seemingly, there was no apprehension on the part of either Court or counsel as to whether the defendant knew what was going on and had the capacity and ability to waive a jury trial as to insanity at the time of the commission of the offense or as to his guilt. In view of the fact that the trial judge was aware of the severe personality disorder as evidenced by the several reports which were furnished, it follows that a hearing should have been held to ascertain whether the defendant's condition permitted him to enter a plea of guilty and to be sentenced to a term of one day to life in prison.

The trial court did not abuse his discretion in this regard; no discretion was exercised. The important question was never considered.

■ It remains to inquire whether this failure to consider defendant's capacity to enter a plea of guilty and his capacity to be sentenced constituted a violation of federally-protected rights of the Constitution of the United States.

Rule 11(a) of the Colorado Rules of Criminal Procedure, which were not in force at the time, provide that the Court shall not accept a plea of guilty without determining: first, whether the plea is made voluntarily with understanding of the nature of the charge; and second,

explaining to the defendant his right to trial by jury, his right to counsel, and the possible penalty provided by statute for the offense charged. Rule 11(a) articulates that which is required by due process; namely, that the plea shall be made voluntarily and intelligently and with a full explanation as to its consequences. The Colorado cases recognize that a plea made without these safeguards cannot be validly accepted. See Martinez v. People, Colo., 382 P.2d 990 (1963); Vanderhoof v. People, 152 Colo. 147, 380 P.2d 903 (1963). There was, as shown, no dearth of evidence before the Court as to the possible inability of the accused to understand the nature of the proceedings including the charge. The undisputed evidence was that although he knew the difference between right and wrong, he had a serious mental illness; indeed, the trial court so found.

The undisputed facts before this Court are that the defendant was unable at the time to remember the details of the offense and that since its commission he has been subconsciously unable to remember these details until a relatively recent date. Dr. Kalina, the prison Psychiatrist, confirmed this at the hearing on March Second, saying that the inability to remember was, as far as the accused is concerned, sincere.

In the light of the foregoing it must be concluded that the failure of the judge at the trial to consider the question whether the accused was insane at the time and could thus enter a plea of guilty intelligently, constituted a violation of procedural, if not substantive, due process.

■ It is fundamental that a proceeding against an insane person in a criminal matter is a violation of his rights under the due process clause of the Fourteenth Amendment. See Weihofen, Mental Disorder as a Criminal Defense, 471, holding that habeas corpus is a proper remedy in circumstances such as the present. The author states:

"Where constitutional rights are at stake, however, and no other

speedy and efficacious remedy is available, the writ is allowed. Thus, where it is contended that because of defendant's mental incapacity at the time of trial he did not intelligently waive his right to a jury trial, or his right to counsel, or that his plea of guilty was not intelligently made, the writ may issue."

See also Frame v. Hudspeth, 109 F.2d 356 (10 Cir., 1939), and see the dissenting opinion of Judge Phillips. See also Bishop v. United States, 350 U.S. 961, 76 S. Ct. 440, 100 L.Ed. 835 (1955).

■ It is indeed fundamental that an accused may not be tried or sentenced while he is insane. Weihofen, Mental Disorder as a Criminal Defense, states at page 429:

"It has long been the rule of the common law that a person cannot be required to plead to an indictment or be tried for a crime while he is so mentally disordered as to be incapable of making a rational defense, and he cannot be adjudged to punishment or executed while he is so disordered as to be incapable of stating any reasons that may exist why judgment should not be pronounced or executed. *If the court, at any of these stages, has a reasonable doubt whether the defendant is so mentally disordered, it should suspend the criminal proceedings and hold an inquiry on the matter.* * * * (Emphasis supplied)

"The reasons usually given why such mental disorder is held to require the suspension of criminal proceedings against the person have been summarized as follows: 'It would be inhuman, and to a certain extent a denial of the right of trial upon the merits, to require one who has been disabled by the act of God from intelligently making his defense to plead or be tried for his life or liberty. There may be circumstances in all cases of which the defendant alone has knowledge, which may prove his innocence, the advantage of

which, if insane to such an extent that he did not appreciate the value of such facts, or the propriety of communicating them to his counsel, he would be deprived.' * * * *"

Again, Weihofen states at page 454:

"A plea of guilty, to be valid, must be intelligently made. If there is any question, the trial court has the duty to determine the defendant's mental capacity to understand the nature and effect of such a plea before accepting it."

See generally, Weihofen, supra, chapter IX. Of course, the question usually before the court upon collateral attack of the criminal proceedings is whether the trial court abused its discretion in holding that a man was sane at the time of plea or sentence. See Ann. at 142 A.L.R. 961, pp. 966–972. Here there was neither hearing nor decision. The trial court merely held that the accused was mentally ill within the terms of the Sex Offenders Act.

In Hyatt v. United States, D.C., 223 F. Supp. 594, a similar problem was before this Court following the entry of a plea of guilty and the waiver of counsel and sentencing of the defendant. The defendant was sentenced notwithstanding a pre-sentence report which revealed that he was an escapee from a mental institution. In granting his petition, it was said:

"The sensitive and crucial aspect of the present case is the imposition of sentence notwithstanding notice of the prior psychiatric history of the accused. Those facts render questionable the competency of the defendant to intelligently waive counsel; and secondly, pose a possible defense which the petitioner could not be expected to be aware of, making the assignment of counsel essential, Thus, it is deemed necessary to declare invalid the imposition of sentence herein and also the acceptance of the plea of guilty. It is unnecessary to conduct a factual hearing looking to a determination of

whether the accused was in fact sane or insane at the time of the entry of the plea because the record is certain to show that there was evidence which would have been available to an assigned counsel whereby the sanity of the accused at the time of the alleged commission of the offense could have been placed in issue. This being so, it is proper to invalidate the judgment, to now assign counsel, and to re-arraign the defendant. It is, therefore,

"Ordered that the judgment of conviction together with sentence based thereon, be vacated; that counsel be appointed and defendant be re-arraigned." 223 F.Supp. 594, at 598.

In the Hyatt case the decisions of the Tenth Circuit in Ruebush v. United States, 10 Cir., 206 F.2d 810 and Snell v. United States, 10 Cir., 174 F.2d 580, recognizing that a plea of guilty by one who is insane is a nullity, were noted.

■ The burden was, of course, upon the petitioner here to produce sufficient evidence to overcome the presumption of validity and regularity surrounding entry of his plea of guilty herein. The evidence in this regard is more than adequate to overcome this presumption. The fact of the long psychiatric history of the accused; the fact that he was eighteen years of age, that his plea was entered for him; that the judge found that he was mentally ill, together with other evidence that need not be mentioned, constituted an abundant showing to overcome the mentioned presumption.

■ The remaining question is whether the Sex Offenders Act, providing as it does that a defendant who is mentally ill can be sentenced under that Act, is a substitute for the procedure in a case of criminal insanity. C.R.S. '53, 39–8–1 through 39–8–6. No clue is found in the 1953 Act relating to sexual offenders which would indicate legislative intent to supersede the procedure provided for criminally insane defendants. It must be concluded, therefore, that a person who is legally insane as defined in 39–8–1 through 39–8–6, must be committed under those sections and cannot be sentenced under the Sex Offenders Act which assumes that the defendant is legally sane, even though mentally ill.

One other matter should be discussed, and that is the fact that counsel was appointed. This does not cure every deficiency in the record, particularly where, as here, the accused was eighteen years of age, did not himself enter the plea, and did not exercise any volition whatsoever. The Court and counsel had decided that the case was a proper one for sentence to the State Hospital under the Sex Offenders Act. From the record of the transcript of proceedings at the arraignment it does not appear that the defendant had anything to say about it. Furthermore, it is not apparent that his counsel had access to the psychiatric reports.

Inasmuch as he was entitled to have the Court consider whether he was insane at the time of the commission of the offense and, therefore, whether he had the capacity to voluntarily enter a plea of guilty, his rights were violated notwithstanding that his appointed counsel participated in the decision. It may well be that after an inquiry has been made in State court as to the sanity of the accused at the time of entry of plea and at the time of sentence, it will be concluded that he was sane. He is, nevertheless, entitled to have the matter heard and determined in accordance with the procedure prescribed by the Colorado statutes.

The question concerning the sanity of the accused at the time of the commission of the offense is not before us. It has not heretofore been raised in State Court or in this Court, and thus we do not presume to decide whether the petitioner's constitutional rights were violated by reason of the failure to make this inquiry. If it appears that the plea of guilty was entered at a time when the accused was incapable of entering such a plea, and if the trial Court thereafter allows the plea of guilty to be withdrawn, a plea of not

guilty by reason of insanity could be entered and this question could be then considered. If it is concluded that the defendant was sane at the time of the entry of the plea the question whether he was insane at the time of the commission of the offense could then be presented to the trial Court.

A final contention of the petitioner is that the order transferring him from the State Hospital to the Penitentiary is invalid as it was issued by the Governor without the approval of the Public Institutional Advisory Board as required by C.R.S. '53, 74-2-4. At the time that he was transferred, the Advisory Board had been abolished. See Session Laws 1959, Chapter 35, section 2, page 152.

In view of our holding that the petitioner's constitutional rights were violated by failing to hold a hearing on the question of insanity at the time of arraignment and sentence, it is unnecessary to consider whether the order transferring him to the State Penitentiary constituted a violation of his constitutional rights. We refrain from comment on this issue.

In summary then, it is concluded that the petitioner's constitutional rights were violated at the time of his arraignment and sentence in December, 1953, and in January, 1954, and that, therefore, his confinement in the penitentiary at the present time is invalid. This Court does not hold that it affirmatively appears that the accused was insane as that term is defined in the Colorado Statute at the times in question. The holding here is that the defendant was entitled to a hearing and that he is now entitled to a hearing on the question of his then capacity.

Counsel for petitioner is directed to prepare and submit an order which will carry out the views which are herein expressed.

Finally, the Court wishes to express its thanks to appointed counsel and to the Assistant Attorney General of the State of Colorado for their most competent representation. Appointed counsel, acting without compensation, made a most commendable contribution.